**E-FILED**
Wednesday, 27 September, 2006  03:53:46 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

CLIFFORD A. SNEATH,              )
                                 )
          Plaintiff,             )
                                 )
     v.                          )          Case No. 05-4028
                                 )
JO ANNE B. BARNHART,             )
COMMISSIONER OF SOCIAL           )
SECURITY ADMINISTRATION,         )
                                 )
          Defendant.             )

# O R D E R

     Before the Court are Plaintiff's Motion for Summary Judgment
[Doc. # 10] and Defendant's Motion for Summary Affirmance [Doc. #
14].  For the reasons set forth below, Plaintiff's motion will be
denied and Defendant's motion will be granted.

## I.    Background

     Plaintiff filed an application for Disability Insurance
Benefits (DIB) on January 14, 2002, alleging a disability onset
date of January 1, 1999, due to heart and lung disease, edema,
diabetes, peripheral neuropathy, and high blood pressure.  (R. at
39, 54-55).  Plaintiff was 55 years old on the date he filed his
application. (R. at 30.) His application was denied initially and
upon reconsideration.  (R. at 25-28, 32-35.)  He then requested a
hearing before an Administrative Law Judge ("ALJ"), which occurred
on March 26, 2003.  (R. at 247.)  Plaintiff (who was represented
by counsel) and a vocational expert testified at the hearing.  (R.
at 246.)  In an August 13, 2003 decision, the ALJ found Plaintiff
was not entitled to benefits.  (R. at 289.) On February 18, 2005,
the Appeals Council denied Plaintiff's request for review of the

ALJ's decision.  (R. at 1B.)

The record reveals the following regarding Plaintiff's medical conditions.  In June 1999 Plaintiff went through a series of exams. The physicians' notes of those exams reveal that Plaintiff was attempting to quit smoking, that he had had anxiety attacks and ongoing Gastroesophageal Reflux Disease (GERD), that he had elevated hypertension which was then adequately controlled but needed close monitoring, that he had lower extremity edema which did not cause significant functional limitations at that time, and that he needed to be treated aggressively for coronary artery disease due to his history of a myocardial infarction and triple by-pass surgery in November 1996. (R. at 196-200.)

In February 2001, Plaintiff reported to his primary treating physician Dr. Ananda R. Reddy with a tooth ache and pain in his feet.  (R. at 187.)  Dr. Reddy recommended Plaintiff consult with a foot clinic.  (R. at 189.)  In July 2001, Plaintiff was given orthotics during a physical therapy consultation for his foot pain. The progress notes indicate Plaintiff had some mild improvement with orthotics, and state a long term goal of decreasing pain to allow Plaintiff to sleep at night.    (R. at 177, 183-84.)   In August 2001, Plaintiff was referred for a diabetes educational consultation because of high fasting blood sugars.  (R. at 172.) Also in August 2001, Plaintiff reported to Dr. Reddy with a burning sensation in his feet, a rash, and teeth problems.  Dr. Reddy attributed the rash to anxiety and noted a loss of sensation in the "dorsum of the foot" without tenderness.  (R. at 174-75.)

In September 2001, Plaintiff fractured his left ankle. (R. at

2

167.)   A steal plate and screws were installed to stabilize the fracture.  (R. at 155-56.)  At a follow up examination, Dr. Rola H. Rashid reported that Plaintiff's ankle was healing well, but that there was some mild swelling present and that Plaintiff had generalized decreased sensation secondary to diabetes.  (R. at 152.)

In December 2001, Dr. Reddy examined Plaintiff and reported that his left ankle pain was getting better but was not gone, that the burning sensation in Plaintiff's feet was getting better, and that Plaintiff was still experiencing swelling in his left ankle which she observed was still warm, painful, and tender.  (R. at 140-41.)  A foot examination by a nurse practitioner that same day revealed abnormal sensory results.  (R at 144.)

In February 2002, Plaintiff reported to Dr. Jerry A. Kreiter with elbow pain.  Plaintiff was diagnosed with bursitis and fluid was drained from his elbow.  (R. at 127-28.)  In March 2002, Plaintiff received complete dentures.  (R. at 126.)  He also had x-rays taken of his left ankle which showed the metallic plate and multiple screws but no acute abnormality.  (R. at 106.)

On March 12, 2002, a consultative exam was performed by Dr. Stanley Rabinowitz at the agency's request.   Dr. Rabinowitz observed that Plaintiff was morbidly obese, that he had uncorrectable vision of 20/200 in his left eye (possibly from an old injury), that he had evidence of peripheral neuropathy, and that his pulmonary function tests revealed mild mixed restrictive and obstructive airway disease.  Dr. Rabinowitz diagnosed mild chronic obstructive pulmonary disease, chronic cigarette

dependence, essential hypertension controlled with therapy and without end organ dysfunction, Type II adult onset non-insulin dependent diabetes with a history of peripheral neuropathy, coronary artery disease with old myocardial infarction and status post three vessel coronary artery bypass graft surgery without recurrent chest pain, and post-traumatic arthritis in the left ankle from the previous fracture. (R. at 101-05.)

On March 28, 2002, a Functional Capacity Assessment was completed by an agency medical consultant. The examiner acknowledged that he did not have the benefit of any examining sources statements regarding Plaintiff's physical capacities. (R. at 115.) The examiner found that Plaintiff was limited to lifting a maximum of 20 pounds occasionally and 10 pounds frequently; that he should avoid concentrated exposure to fumes, odors, dust, and gases; and that he had a slow gait with small steps, decreased breath sounds and decreased range of motion in his left ankle with moderate peripheral edema. (R. at 109-16.)

In April 2002, Plaintiff returned to Dr. Reddy with complaints of constant foot pain in both feet which contributed to him not being able to walk. Dr. Reddy observed that Plaintiff had impaired sensation to touch below the ankle, and that he tested positive for depression. (R. at 122-25.) In October 2002, Plaintiff's wife reported that he was restless and had sleep disturbances as a result of the medication he was taking for his neuropathy (Neurontin). (R. at 206A.)

On April 7, 2003 (after the hearing but before the ALJ issued its decision), Plaintiff saw Dr. Reddy with reports of increased

4

fatigue for the past 3-4 months, more frequent heartburn and constipation. (R. at 208.) On July 22, 2003, Plaintiff was admitted to the hospital for another acute myocardial infraction and underwent a successful angioplasty and stenting. (R. at 214.) Following his surgery, Plaintiff attended rehabilitation at Trinity Cardiac Rehab. After initial complaints of light-headedness and shortness of breath, Plaintiff eventually tolerated exercise well and did not experience any further symptoms of angina with activity. (R. at 216-217.)

At the March 26, 2003, administrative hearing Plaintiff amended his alleged onset date to his 55th birthday, February 16, 2001, and testified to the following. (R. at 248.) Plaintiff worked at Montgomery Kone for twenty-five years. His positions at Kone included inventory control, stockroom receiving person, and small parts assembler. (R. at 248-50.) After leaving Kone in 1998, Plaintiff worked for two months as a bartender at a bowling alley but was forced to quit due to leg pain and swelling. (R. at 251-52.) Plaintiff testified that he had a heart attack on Thanksgiving Day in 1997, and underwent triple bypass surgery as a result. (R. at 252-53.) He testified that he no longer had chest pain as long as he did not do anything physical, and that he was "scared" to use nitroglycerin. (R. at 253.) Plaintiff stated that he had reduced his smoking from three packs per day to one pack per day but was unable to completely quit. (R. at 253-54.) He indicated he had to catch his breath after walking to the mailbox and back, and that his diabetes was suppose to be controlled with diet and exercise, but that he couldn't do the exercise. He stated

that his neuropathy caused the bottoms of his feet to feel "totally numb all day long" and that if he stood or sat too long his feet would "turn to fire." (R. at 254.)  Plaintiff's only relief for the numbness and burning sensation was to elevate his legs and attempt to stay off of his feet as much as possible. (R. at 254.) At times his legs would also swell and he would have to elevate them for a couple of hours before the symptoms subsided. (R. at 255.) Plaintiff testified that his left ankle caused more problems than his right. (R. at 257.)  Plaintiff also testified that he experienced fatigue as a result of his medications and that he needed to take two naps a day lasting one to two hours each. (R at 257, 262.)

Plaintiff also testified that he had problems with pain in his elbow and numbness in his left hand. (R. at 258.)  With regards to walking, Plaintiff testified that he had to take "baby steps" when trying to walk on uneven surfaces. (R at 259.)  He also stated that he could only be on his feet for one or two hours during an eight-hour work day and would need to rest every half hour. (R. at 260.)  Plaintiff stated that his girlfriend did all of the household chores, cooking and cleaning, and that he sometimes used a cane. (R. at 260-61.)  He also testified that he often has back pain due to a degenerative disk and a back injury he received at work. (R. at 261.)  As a result he could not sit continuously for more than one hour. (R. at 262.)  Plaintiff stated that he could lift up to 35 pounds while standing still but could not carry more than five or ten pounds. (R. at 263.)

In response to questioning by the ALJ, Plaintiff testified

6

that he was forced to quit his job at Montgomery Kone because he was having a lot of difficulty with his legs swelling. (R. at 266.) He stated that he could not do any work because he experienced leg swelling when sitting and his feet would start burning. (R. at 267.) He further testified that he told his doctors that the medicine he was taking for his neuropathy was making him drowsy but when he tried to decrease the dosage the pain and burning became unbearable. (R. at 268.)

The VE testified that most of Plaintiff's previous work was light to heavy semi-skilled work. (R. at 269.) The ALJ described Plaintiff's limitations as follows:

> This gentleman is 55 years old. He has a GED certificate. He had three-vessel bypass surgery. He had a left ankle fracture and he was diagnosed with non insulin dependent diabetes mellitus and he does have neuropathy in his lower extremities which, for which he takes Neurontin. It would appear in terms of lifting that he should be able to lift 25 pounds frequently and occasionally. The problem is carrying the weight. He indicated that he would only be able to carry five and ten pounds while walking. Because of the numbness in his lower extremities, he should be able to sit about an hour at a time and then change positions and then sit again. He should be able to sit for six hours in an eight-hour day. In terms of standing in place he should be able to stand in place at least 30 minutes at a time and then change position. He would have difficulty because of his weight and because of the neuropathy in his feet, climbing, balancing, stooping, crouching, crawling and kneeling, and should probably only perform those functions occasionally. He does have chronic obstructive pulmonary disease, but he continues to smoke down from three packs to one pack a day. And while he's smoking, I'm not going to put any environmental limitations on him. He has no communicative limitations. There is nothing in the record to indicate that his condition requires that he lay down for four hours every day or that laying down in any way helps his condition. The doctors have recommended diet and exercise, again which he has not done. There is nothing in the record to

> indicate that any of his medication causes excessive sleepiness during the day which would require sleeping for four hours.  In any event, with those restrictions would he be able to perform any past work activity?

(R. at 270-71.)  Based on this hypothetical the VE opined that such an individual could not return to Plaintiff's past work.  (R. at 271.)  The VE also testified that such an individual would have skills in compiling records, maintaining records, using a computer, and customer relations that could be transferred to other semiskilled occupations.  (R. at 272.)  He further stated that such an individual would be able to perform semiskilled work as a gate tender, telephone solicitor, telephone answering operator, and security guard.  (R. at 272.)

When questioned by Plaintiff's attorney, the VE testified that the four jobs he listed were all semi-skilled jobs which would require training of greater than 30 days.  (R. at 276.)  The VE also testified that it did not matter that Plaintiff only worked as a bartender for two months, as he would still have transferable customer relation skills from that experience.  (R. at 273.)  Finally, the VE testified that the need to alternate positions between sitting and standing every 30 minutes would not affect the jobs he listed, but that an individual who needed to take excessive work breaks would not be employable, nor would an individual that needed to sit with his feet elevated for an hour or more during an eight-hour workday.  (R. at 274-75.)

In an August 13, 2003 decision, the ALJ found that Plaintiff had severe impairments, including chronic obstructive pulmonary disease; chronic cigarette dependence; essential hypertension, controlled on therapy without end organ dysfunction; Type II adult

onset non-insulin dependence diabetes mellitus, controlled on therapy with history of peripheral neuropathy; history of coronary artery disease with old myocardial infarction, status post three vessel coronary artery bypass grafting (CABG) surgery without recurrent chest pain; and history of fracture of left ankle and post-traumatic arthritis.  She found that Plaintiff's impairments did not, singly or in combination, meet or medically equal any of those included in the Listing of Impairments, and that Plaintiff's allegations of disabling limitations were not fully credible.  As to Plaintiff's credibility, she stated:

> The undersigned finds that there is sparse medical evidence in the record, and none of it supports the claimant's contention that he needs or medically requires napping for 1-2 hours in the morning and 2 hours in the afternoon.  He worked after his 1996 heart attack, but retired, with pension in 1999.  An aggravating factor in this case is that the claimant has been noncompliant with medical advice.  His doctors have told him he needs to lose weight, but he keeps gaining weight (Exhibit 3F, P. 64).  His doctors have told him to quit smoking, but he still smokes.  As recently as April 7, 2003, he told the VA medical staff that he was "not currently interested" in a tobacco use cessation program (Exhibit 5F, p. 6).  He does not exercise, and he continues to drink alcohol, both against the advice of his doctors.  Medical records indicate that the Neurontin helps his neuritis (Exhibit 4F, p. 3).

The ALJ then concluded that Plaintiff had the residual functional capacity to do work that did not require lifting more than 25 pounds occasionally and frequently; carrying 5-10 pounds while walking; standing for 30 minutes at a time and sitting for one hour at a time and then changing positions; sitting for a total of about six hours in an eight-hour day; and only occasionally climbing, balancing, stooping, crouching, crawling, or kneeling.  Plaintiff

required the option to alternate sitting and standing every 30 minutes in an 8-hour day. The ALJ concluded that Plaintiff could not perform his past relevant work, but based on the testimony of the VE, she concluded that Plaintiff could perform a significant number of jobs in the economy and, therefore, was not disabled. (R. at 288-89.)

## II. __Legal Standard__

In order to be entitled to disability insurance benefits, a plaintiff must show that his or her inability to work is medical in nature and that he or she is totally disabled. See 20 C.F.R. § 404.1505. Economic conditions, personal factors, financial considerations, and attitudes of employers are irrelevant in determining whether a plaintiff is eligible for disability benefits. See 20 C.F.R. § 404.1566.

The establishment of disability under the Act is a two-step process. First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. See 42 U.S.C. § 1382c (a)(3)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. See McNeil v. Califano, 614 F.2d 142, 143 (7th Cir. 1980). That factual determination is made by using a five-step test. See 20 C.F.R. §§ 404.1520.

The five-step test is examined by the ALJ, in order, as follows: (1) is the plaintiff presently unemployed; (2) is the

plaintiff's impairment "severe" (20 C.F.R. § 404.1521,); (3) does the impairment meet or exceed one of the list of specified impairments (20 C.F.R. Pt. 404, Subpt. P, App. 1); (4) is the plaintiff unable to perform his or her former occupation; and (5) is the plaintiff unable to perform any other work within the national economy?

An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled.  A negative answer at any point, other at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled.  See Garfield v. Schweiker, 732 F.2d 605, 607 n.2 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4.  However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment.  See Tom v. Heckler, 779 F.2d 1250, 1253 (7th Cir. 1985); Halvorsen v. Heckler, 743 F.2d 1221, 1225 (7th Cir. 1984).

The Court's function on review is not to try the case de novo or to supplant the ALJ's finding with the Court's own assessment of the evidence.  See Pugh v. Bowen, 870 F.2d 1271, 1274 (7th Cir. 1989).  The Court must only determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied.  See Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  In determining whether the ALJ's findings are supported by substantial evidence, the Court must consider whether the record, as a whole, contains "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). Credibility determinations made by the ALJ will not be disturbed unless the finding is clearly erroneous. See Imani v. Heckler, 797 F.2d 508, 510 (7th Cir.), cert. denied, 479 U.S. 988 (1986).

## III. Analysis

Plaintiff argues (1) that the ALJ improperly discounted his complaints of fatigue, (2) that the ALJ legally erred when she made no specific finding of transferable skills, and (3) that the ALJ's finding regarding Plaintiff's ability to work in view of her sit-stand restrictions is contrary to Social Security Administration Rulings. The Court will address each argument in turn.

## A. The ALJ did not clearly err in finding that Plaintiff's testimony regarding his fatigue was not credible.

The ALJ discredited Plaintiff's testimony that his medications, and in particular Neurontin, made him tired and that he needed to nap as a result, finding that there was no medical evidence to support Plaintiff's naps as medically necessary. The medical records show that on October 2, 2002, Plaintiff reported that Neurontin was helping with his neuritis in his feet, however, Plaintiff's wife reported the Neurontin was causing sleep disturbances. At that time, the doctor recommended Plaintiff reduce his Neurontin to twice a day instead of three times a day. (R. at 206-07.) April 7, 2003 Physician's notes indicate that Plaintiff reported increased fatigue for the past 3-4 months despite the reduction in the Neurontin dose. At that time the doctor noted that Plaintiff fatigued easily and that the doctor wanted to rule out sleep apnea. (R. at 208-09.) The *Physicians*

12

*Desk Reference ("PDR")* (5th Edition) lists dizziness and somnolence as the most commonly observed adverse side effect of Neurontin.

The ALJ discounted Plaintiff's complaints of fatigue noting that he was not following his physician's recommendations, one of which was to get more exercise.  While the medical records show Plaintiff had complained about fatigue for about 3-4 months, they also show that his doctors where attempting to address this complaint by evaluating Plaintiff for sleep apnea, encouraging him to exercise more, and adjusting his medication.  However, there is no medical evidence in the record suggesting these treatments were unsuccessful.  Accordingly, The Court finds that the ALJ's finding was not clearly erroneous.

**B.    The ALJ implicitly adopted the VE's testimony regarding Plaintiff's transferable skills, and thus did not legally err by not specifically adopting the testimony in her written decision.**

Social Security Ruling 82-41(6) states:

Findings of fact in determinations or decisions involving transferability of skills.  When the issue of skills and their transferability must be decided, the adjudicator or ALJ is required to make certain findings of fact and include them in the written decision.  Findings should be supported with appropriate documentation.  **When a finding is made that a claimant has transferable skills, the acquired work skills must be identified, and specific occupations to which the acquired work skills are transferable must be cited in the State agency's determination or ALJ's decision.**  Evidence that these specific skilled or semiskilled jobs exist in significant numbers in the national economy should be included (the regulations take administrative notice only of the existence of unskilled sedentary, light, and medium jobs in the national economy).  This evidence may be VS statements based on expert personal knowledge or substantiation by information contained in the publications listed in regulations sections 404.1566(d) and 416.966(d).  It is important that these findings be

made at all levels of adjudication to clearly establish
the basis for the determination or decision for the
claimant and for a reviewing body including a Federal
district court.

(emphasis added).   Defendant concedes that the ALJ failed to specifically make findings regarding the transferability of Plaintiff's job skills, but argues that it is obvious from the ALJ's decision that she intended to rest her decision on the Vocational Expert's testimony regarding Plaintiff's transferable job skills.   In that regard, the ALJ's written decision states:

> The claimant's age has ranged from 55-57 years old from his alleged onset date through the date of this decision, which is defined in the Regulations as a "person of advanced age" (20 CFR 404.1563(d)).   He has the equivalent of a high school education (GED), and past relevant vocational experience in unskilled and semi-skilled work (Exhibit 9E).   His residual functional capacity is set forth above.   The vocational expert testified that the claimant has skills acquired in compiling and maintaining records, use of a computer, and customer relations skills that are transferable to the following jobs: gate tender, D.O.T. # 372.667-030, light, 350 jobs in the regional economy, 41,000 jobs in the national economy; telephone solicitor, D.O.T. #299.357-014, sedentary, 1,000 jobs in the regional economy, 440,000 jobs in the national economy; telephone answering operator, D.O.T. #235.662-026, sedentary, 250 jobs in the regional economy, 50,000 jobs in the national economy; and security guard, D.O.T. #372.667-034, light performed more at the sedentary level, 600 jobs in the regional economy, 62,000 jobs in the national economy.

(R. at 287.)   Thus, the ALJ clearly considered the VE's testimony regarding the transferability of Plaintiff's job skills, she identified the VE's testimony regarding the transferable skills, and she identified the specific occupations to which the acquired work skills were transferable.   The only thing she did not do was specifically state that she officially adopted the VE's testimony in this regard, however, it is obvious from her other findings that

14

she did.  Accordingly, the Court finds the requirements of Social Security Ruling 82-41(6) have been met.

**C.    The ALJ's finding regarding Plaintiff's ability to work in view of her sit-stand restrictions is not contrary to Social Security Administration Rulings.**

Plaintiff argues that the VE's testimony that Plaintiff could perform the phone solicitor and telephone answering positions in view of the requirement that he be able to alternate sit/stand positions every thirty minutes is contradictory to Social Security Rule 96-9p.  SSR 96-9p states:

> Alternate sitting and standing:  An individual may need to alternate the required sitting of sedentary work by standing (and, possibly, walking) periodically.  Where this need cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded. The extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand. The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing. It may be especially useful in these situations to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work.

The Court disagrees that the VE's testimony is contradictory to this ruling.  This ruling contemplates the consultation of vocational resources (like a vocational expert) in determining whether an individual with a sit/stand restriction can adjust to other work.  That is what happened here, and the VE specifically testified that Plaintiff could adjust to phone work.  Accordingly, the Court finds this argument fails.

**IV.**   **Conclusion**

IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment [Doc. # 10] is DENIED and Defendant's Motion for Summary Affirmance [Doc. # 14] is GRANTED.

CASE TERMINATED.


Entered this <u>27th</u> day of September, 2006.



<u>s/ Joe B. McDade</u>

Joe Billy McDade

United States District Judge

16